# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

NATALIE LYNN AGUILAR,

     Plaintiff,

v.                                                    Civ. No. 17-119 GJF

NANCY A. BERRYHILL,
*Acting Commissioner of the*
*Social Security Administration*,

     Defendant.

## ORDER

THIS MATTER is before the Court on Plaintiff's "Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, For Rehearing, With Supporting Memorandum." ECF No. 22. The motion is fully briefed. *See* ECF No. 24 (Commissioner's Response) and 25 (Plaintiff's Reply). The Court held a telephonic hearing on July 20, 2018, at which the parties provided additional argument. *See* ECF No. 30 (transcript). Having meticulously reviewed the entire record, the briefing, and the information provided at oral argument, the Court concludes that the motion should be granted in part and denied in part and that the Administrative Law Judge's ("ALJ's") decision should be vacated and remanded as it relates to the step three listings issue.[1]

## I.    BACKGROUND

Plaintiff was born June 26, 1969. Administrative R. ("AR") 18. She earned her high school diploma and completed a "few credit hours" of college. AR 41. Plaintiff previously

---

[1] Because the Court is remanding on the listings issue, the Court in its discretion will not decide Plaintiff's claims that the ALJ erred in omitting certain limitations from the RFC or in evaluating the credibility of Plaintiff's testimony. But the Court *does* decide herein the step five issue of whether the ALJ erred in finding that there were sufficient jobs in the national economy for someone with Plaintiff's RFC to perform, when the vocational expert's testimony to that effect commingled both full-time and part-time jobs.

worked as a school board assistant, cashier, van driver, and adult in-home care provider. AR 41-43. Plaintiff filed an application for disability insurance benefits ("DIB") on May 6, 2013, and an application for Supplemental Security Income ("SSI") on June 12, 2013. AR 11. In both applications, Plaintiff alleged a disability onset date of June 3, 2012. AR 11. The Social Security Administration ("SSA") denied both claims initially and again upon reconsideration. AR 11. Plaintiff requested a hearing, which was held by ALJ Benita A. Lobo on March 19, 2015. AR 11. Plaintiff testified at the hearing, as did vocational expert ("VE") Kasey Suggs. AR 11, 152. Plaintiff was represented by counsel. AR 11.

On June 4, 2015, ALJ Lobo issued her decision that Plaintiff was not disabled from June 3, 2012, through the date of decision. AR 19. Plaintiff asked the SSA's Appeals Council ("AC") to review the ALJ's decision, but the AC declined. AR 1. Plaintiff timely filed her appeal in this Court. ECF No. 1.

## II.    PLAINTIFF'S CLAIMS

Plaintiff alleges that the ALJ's conclusion that Plaintiff's spine disorder did not meet Listing 1.04 was supported by insufficient analysis and was contrary to the medical evidence of record. *See* Pl.'s Mot. 7-11, ECF No. 22. Plaintiff also asserts that the ALJ erred by omitting from the Residual Functional Capacity ("RFC") finding certain limitations based on Plaintiff's depression and ability to climb stairs. *Id.* at 12-14. Plaintiff next argues that the ALJ's unfavorable credibility determination was contrary to substantial evidence and applicable law. *Id.* at 14-21. Finally, Plaintiff contends that the ALJ erred by failing to clarify the VE's testimony concerning (a) the number of full-time jobs and part-time jobs in the national economy that Plaintiff can perform, and (b) the occupation of office clerk that the VE testified Plaintiff can perform. *Id.* at 21-25.

## III.    APPLICABLE LAW

### A.    Standard of Review

When the Appeals Council denies a claimant's request for review, the ALJ's decision becomes the final decision of the agency.[2]  20 C.F.R. § 422.210(a) (2017).  The Court's review of that final agency decision is both factual and legal.  *See Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992)) ("The standard of review in a social security appeal is whether the correct legal standards were applied and whether the decision is supported by substantial evidence.").

The factual findings at the administrative level are conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g) (2012).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214.  Substantial evidence does not, however, require a preponderance of the evidence.  *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).  A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.  *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214.

As for the review of the ALJ's legal decisions, the Court reviews "whether the ALJ

---

[2] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g) (2012), which generally is the ALJ's decision, not the Appeals Council's denial of review.  20 C.F.R. § 404.981 (2016); *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).

followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases." *Lax*, 489 F.3d at 1084. The Court may reverse and remand if the ALJ failed "to apply the correct legal standards, or to show . . . that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

Ultimately, if substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214, *Doyal*, 331 F.3d at 760.

### B.     Sequential Evaluation Process

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2016). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ proceeds to the first of three phases of step four and determines the claimant's residual functional capacity ("RFC"). *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(e), 416.920(e). In phase two, the ALJ determines the physical and mental demands of the claimant's past relevant work, and in the third phase, compares the claimant's RFC with the functional requirements of her past relevant work to determine if the claimant is still capable of performing her past work. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing her past work, then she is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant bears the burden of proof on the question of disability for the first four steps, and then

the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

If the claimant cannot return to his or her past work, then the Commissioner bears the burden at the fifth step of showing that the claimant is nonetheless capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## IV.     THE ALJ'S DECISION

At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017, and had not engaged in substantial gainful activity since the alleged disability onset date of June 3, 2012. AR 13. At step two, the ALJ determined that Plaintiff had the following severe impairments: sciatica, obesity, left knee chondromalacia, and diabetes mellitus. AR 13. The ALJ considered whether Plaintiff's depression was severe, but concluded it was not because "[m]ental status examinations have not identified any significant psychological abnormalities[,]" and although Plaintiff initially reported depression in August 2013, she did not seek treatment until August 2014. AR 14. The ALJ continued, "Based on the evidence of record, the undersigned concludes that this condition has no more than a minimal effect on the claimant's ability to perform basic work activities and hence is not a severe impairment." AR 14. At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 14. The ALJ specifically considered Listings 1.02 and 1.04, as well as "any other listed impairment." AR 14.

At step four, the ALJ determined Plaintiff's RFC as follows:

After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except no climbing of ladders, ropes, scaffolds; no work on uneven/vibrating surfaces, no work at heights; and occasional stooping, kneeling, crouching, crawling. [Plaintiff] would need to alternate sitting/standing every 10-15 minutes, for a few minutes at a time without leaving her workstation, [and] would require a cane to ambulate and elevate her feet under the desk.

AR 14.

As part of determining the RFC, the ALJ reviewed the medical evidence in the record. AR 14-18. The ALJ considered a notation from Dr. Annmarie Overholser[3], M.D., and the opinions of non-examining state agency medical consultants Dr. Mark A. Werner[4], M.D., and Dr. Kenneth Glass, M.D. AR 73-80, 83-92, 654. In addition, the ALJ reviewed medical records from Gallup Indian Medical Center [AR 287-90, 381-405, 494-516], Tohatchi Health Center [AR 291-353, 355-56, 420-93, 636-47], Indian Health System Tohatchi [AR 357-380], Enchantment Physical Therapy [AR 617-35, 648-53], Navajo Nation Division of Social Services [AR 654-55], and New Mexico Orthopedics [AR 656-761]. The ALJ thoroughly reviewed primary care records from June 2012 to August 2013 [AR 15] and physical therapy records from September 2012 to February 2015 [AR 15]. The ALJ also discussed Plaintiff's lumbar spine X-ray taken sometime between June 2012 and September 2012,[5] Plaintiff's lumbar spine Computed Tomography ("CT") scan in October 2013, and Plaintiff's lumbar Magnetic Resonance Imaging

---

[3] Although the ALJ wrote "Annmane Oveholser", Plaintiff refers to this physician as Annmarie Overholser, which the Court will also do throughout this opinion. *See* AR 16-17, 654; Pl.'s Mot. 13, ECF No. 22.

[4] Although the ALJ referred to Dr. Werner as Dr. Walker in her decision, the record reflects that his name is Dr. Werner. AR 78.

[5] Plaintiff underwent a physical therapy consultation with Jordan C. Burnett on September 11, 2012. AR 337. Plaintiff reported that she was injured in June 2012. AR 337. Burnett referred to X-ray images of Plaintiff's spine, which showed among other impressions that she had "[n]arrowing of the LS-S1 interspace with vacuum phenomenon. L4–L5 interspace appears mildly narrowed posteriorly. Slight to mild spur formation at a few lumbar levels." AR 339. The X-ray images themselves and their accompanying report do not appear in the record, so it is unclear exactly when they were taken.

("MRI") scan in July 2014. AR 15. Lastly, the ALJ reviewed the hearing testimony of Plaintiff [AR 15-16] and the VE [AR 19].[6]

*Dr. Annmarie Overholser, M.D.*

Dr. Overholser was Plaintiff's primary care physician. *See* AR 570. The ALJ assigned "some weight" to Dr. Overholser's June 3, 2014, notation, but opined that, with respect to Plaintiff's ability to sit, stand, or walk for prolonged periods of time, "the doctor's opinion on time, no more than 5-10 minutes, contrasts sharply with the other evidence of record, and [Plaintiff's] testimony at the hearing, which renders this opinion less persuasive." AR 16. Plaintiff saw Dr. Overholser for appointments on December 17, 2013 [AR 482], January 24, 2014 [AR 386, 448], June 3, 2014 [AR 457], and July 2, 2014 [AR 510]. The Navajo Nation Division of Social Services requested updated information regarding Plaintiff's health status from Dr. Overholser since Plaintiff received cash assistance from the Division, and a requirement of that assistance was that Plaintiff work in an approved work activity. AR 654. On June 3, 2014, Dr. Overholser wrote that Plaintiff had "limited mobility due to back [and] knee pain. [She] cannot sit for prolonged periods of time (no more than 5-10 minutes)." AR 654.

*Dr. Mark A. Werner, M.D.*

Dr. Werner is a non-examining consultative physician who reviewed Plaintiff's records on August 7, 2013. AR 78. The ALJ assigned "some weight" to Dr. Werner's opinion, but noted that "additional medical evidence received [ ] after the date of the state agency determination . . . justifies a conclusion that [Plaintiff's] impairments are more limiting than was concluded by the state agency consultants. Updated medical records show [Plaintiff] ambulating

---

[6] Specifically, the ALJ concluded that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" AR 16. Although Plaintiff has raised in this appeal the separate issue of whether the ALJ erred in assessing her credibility, the Court's resolution of this appeal does not require it to resolve this issue and the Court expresses no view on its merits.

with a walker and then cane . . . which would reduce her to sedentary work." AR 17. Dr. Werner reviewed records from Tohatchi Health Center, Gallup Indian Medical Center, a third party functional report from July 2, 2013, a headache questionnaire, Plaintiff's functional report from July 1, 2013, and Plaintiff's work history. AR 74-75. Dr. Werner concluded that Plaintiff had severe impairments of "other and unspecified arthropathies" and major joint dysfunction. AR. 76. Dr. Werner also concluded that Plaintiff had non-severe diabetes mellitus. AR 76. Dr. Werner considered Listing 1.02, but did not consider Listing 1.04. AR 76. Dr. Werner found Plaintiff to be credible. AR 76. Dr. Werner concluded that Plaintiff had "more than a non-severe impairment and her impairments do not meet or equal the listings[,]" and that Plaintiff had the capacity to perform light work. AR 75, 79.

Dr. Werner opined that Plaintiff can occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk with breaks for a total of approximately six hours per day, and could sit with normal breaks for a total of six hours per day. AR 77. Dr. Werner also opined that Plaintiff had an unlimited ability to push or pull, that Plaintiff could only occasionally climb ramps or stairs, climb ladders, ropes, and scaffolds, stoop, kneel, crouch, or crawl, and that she could frequently balance. AR 77. Dr. Werner concluded that Plaintiff was not otherwise functionally limited. AR 77.

*Dr. Kenneth Glass, M.D.*

Dr. Glass is a non-examining consultative physician who reviewed Plaintiff's records on November 25, 2013, upon reconsideration. AR 92. The ALJ assigned "some weight" to Dr. Glass's opinion, but noted, as with Dr. Werner's opinion, that "additional medical evidence" of Plaintiff's limited ability to ambulate reduced her to sedentary work. AR 17.

Besides what Dr. Werner reviewed, Dr. Glass reviewed additional records from Indian Health System Tohatchi, another third party function report, additional records from Tohatchi Clinic, and evidence from Plaintiff. AR 84-85. With respect to whether there had been any changes to Plaintiff's condition since she last submitted a disability report, Plaintiff wrote that on August 26, 2013, the dosage of medication for her nerves increased, she was diagnosed with sciatica, and she was referred to physical therapy. AR 84. Plaintiff also wrote, "I still can't [sit] for long periods of time without being in pain/not stand for long periods of time which would limit me to any work or daily activities." AR 84.

Dr. Glass noted that Plaintiff was examined on July 24, 2013, and presented with spine tenderness, slight discomfort with a straight leg raise, and pain with pushing her leg back down. AR 90. During that examination, Plaintiff had tender lateral, knee, and thigh muscles, and her left leg was significantly smaller in diameter than her right leg. AR 90. The examiner could not palpate Plaintiff's left foot well due to a tremor, and Plaintiff had decreased sensation to touch with numbness on the sole of her lateral foot and toes. AR 90. Plaintiff could not stand on her tiptoes or heels without assistance. AR 90. Plaintiff was also unable to walk on her tiptoes or heels. AR 90. Dr. Glass noted Plaintiff's follow up appointment on August 26, 2013, during which Plaintiff reported that her back pain was better since she began taking Neurontin and that she still had "some sciatica and weakness" but her pain and function were better. AR 90. Plaintiff walked daily with a walker and was also doing exercise she learned from a "boot camp guy." AR 90.

Dr. Glass reviewed Plaintiff's activities of daily living as of September 2013. AR 90-91. Plaintiff could care for herself and her children, but needed assistance with putting on her socks and shoes. AR 90-91. Plaintiff reported that she could cook simple meals and perform light

tasks around the house, and that she visited family and friends. AR 91. Plaintiff also described being able to walk approximately 100 to 200 feet using a walker or cane and a knee brace. AR 91. Dr. Glass concluded that Plaintiff "should be able to perform" within the RFC he described. AR 91.

Dr. Glass generally affirmed Dr. Werner's findings and conclusions, except that Plaintiff had limited ability to push and pull in both lower extremities, and that Plaintiff "is limited to occasional ambulation on unlevel ground." AR 89. Like Dr. Werner, Dr. Glass considered Listing 1.02, but did not consider Listing 1.04. AR 88. Dr. Glass also concluded that Plaintiff had environmental limitations because she should avoid concentrated exposure to operating heavy machinery "due to back pain." AR 90.

*Plaintiff's Testimony*

Plaintiff testified that she lived with two of her children, and that she had a high school diploma and a few credit hours of college. AR 41. Plaintiff also testified that she had last worked on June 6, 2012, as a school board assistant. AR 41. Plaintiff's other past work included being a cashier for eight years with different employers, a van driver for one year, and an adult in-home care provider for six years. AR 42. When the ALJ asked Plaintiff why she felt she could not work, Plaintiff responded, "I injured myself and I injured two of my discs." AR 42-43. Later, when Plaintiff's attorney asked her what kept her from working, Plaintiff responded, "What keeps me from working is probably number one, I can't sit very long, I can't stand very long." AR 56-57. Plaintiff confirmed that her injury was not work related. AR 43. When the ALJ asked Plaintiff to clarify the injury to her discs, Plaintiff stated that she "had slipped" two of her discs, the treatment for which had included one injection in her spine, one injection in her hip, two injections in her knee, and physical therapy. AR 43. Plaintiff described pain spreading

from her left hip down to her feet, and testified that she was told that the pain is due to her disc because "it's probably on a nerve." AR 45. Plaintiff also suffered from knee pain and muscle spasms. AR 45.

When the ALJ asked Plaintiff which pain medications she was taking, Plaintiff initially stated that she did not know the names of the medications, but then said she was taking meloxicam and gabapentin. AR 45. Plaintiff then stood up during the hearing because she had been sitting for "too long." AR 45-46. The ALJ asked Plaintiff to describe her activities of daily living. Plaintiff testified that she normally tried to get up and get ready before her youngest daughter left for school because Plaintiff still required assistance when she showered. AR 48. Plaintiff stated that she was improving in her ability to bathe herself and put on pants, shoes, and socks. AR 55. Plaintiff normally then ate breakfast and, if she had physical therapy, she attended her appointment. AR 48.

Sometimes Plaintiff cooked meals, and her son and other relatives prepared meals when she could not. AR 48. Plaintiff's children cleaned the house, and Plaintiff also had a "caretaker that comes once a week and does personal care, household chores, [and] transportation if I need to go somewhere." AR 48. The ALJ did not ask whether the caretaker was recommended by a health care provider. Plaintiff, her son, and her home care worker did the shopping. AR 48. Plaintiff's home care worker did the laundry, although occasionally Plaintiff's children did as well. AR 48. Plaintiff testified that she did not visit family and friends very often because she was "more homebound," but that she did attend church every Sunday. AR 48-49. Plaintiff testified that she drove but only locally. AR 49. Plaintiff also listened to the radio, read the newspaper, and crocheted. AR 49.

Regarding functional physical abilities, Plaintiff testified that she could walk "maybe a block with give or take one or two breaks." AR 49. Plaintiff specified that walking on dirt was difficult for her because she felt off balance and was afraid her knee would "give out" on her. AR 51. Plaintiff testified that she could stand for ten to fifteen minutes, and sit for thirty to forty minutes, but when she sat for too long, "it sends a really sharp stabbing pain to my left hip." AR 49. Plaintiff elaborated on her pain, describing it as "feeling like a needle – like [a] needle poking in my knee and then it just like gives it [an] electric shock right up to my hip where – where I got an injection." AR 50. Plaintiff stated that she could lift ten pounds, but doing so was a challenge. AR 49. Plaintiff also testified that she did not have any side effects from her medications except for her depression medication, which re-triggered her migraines. AR 49.

Plaintiff was using a cane on the day of the hearing, and testified that she used a cane every day except at physical therapy. AR 51. Plaintiff was able to stop using a walker due to physical therapy, and she was also trying to stop using the cane. AR 51. Plaintiff testified that, at the time of the hearing, she needed to use the cane "because after my injury, I – my left leg seems to have gotten longer." AR 51. Plaintiff also received a heel lift to keep her pelvis aligned, and noted that she walked with a limp. AR 51. Plaintiff used the cane both for balance and to take weight off her leg. AR 51-52. Plaintiff testified that when she did "excessive" activity like physical therapy, she had "to get off my feet." AR 52. Typically, if Plaintiff was not in a lot of pain, she would lay down maybe four to five times a day throughout the day. AR 52. Occasionally, she remained in bed all day. AR 52.

When Plaintiff's attorney asked if her left leg was stronger, the same, or weaker than her right leg, Plaintiff stated that her left leg "is not that strong," but her right leg is strong and shorter than her left leg. AR 56. Plaintiff also testified regarding sensory loss: "There – I did

lose some feeling to my foot before I started getting injections and when I had the terrible knee problems that came. They told me it was because of the nerve – the nerve to my left leg. I lost feeling underneath my foot towards my two – my pinky toe and the next one to it. But I – I – I gradually got that feeling back through physical therapy." AR 56.

*Vocational Expert Testimony*

Kasey Suggs, a vocational expert ("VE"), testified at the hearing. AR 57. The VE confirmed that she understood that she should advise the ALJ if anything in her opinion conflicted with information in the Dictionary of Occupational Titles. AR 57-58. The VE had reviewed Plaintiff's vocational history prior to the hearing, and identified her past relevant work. AR 58. The ALJ asked the VE to assume a hypothetical person of the same age, education, and vocational history as Plaintiff with Plaintiff's RFC, and asked whether that person could return to her past relevant work. AR 59. The VE stated that the hypothetical person could return to her work as a cashier and administrative clerk, but if she was restricted to sedentary work, she could perform the following three occupations: pari-mutuel ticket checker, which had 455 jobs in New Mexico and 73,537 jobs nationally; receptionist and information clerk, which had 556 jobs in New Mexico and 88,888 jobs nationally; and general office clerk, which had 506 jobs in New Mexico, and 102,562 jobs nationally. AR 59. Each of those occupations would allow Plaintiff to sit for ten to fifteen minutes, then stand for a few minutes, and then sit back down again at her desk or workstation. AR 59-60. Plaintiff would also be able to work in these occupations if she had to use a cane because they are sedentary positions that generally require sitting for approximately six out of eight hours in a day. AR 60. The occupations the VE identified would also permit Plaintiff to elevate her feet under her desk. AR 60.

In response to questioning from Plaintiff's attorney, the VE testified that if Plaintiff took two to three breaks each day for twenty minutes each to rest, she would probably not be able to maintain the jobs identified by the VE or any other job.  AR 61.  Plaintiff's attorney asked if the number of jobs for the three positions identified by the VE were full-time or part-time jobs, and the VE testified that she used the Occupational Employment Quarterly to determine the job numbers, and it combines both full-time and part-time jobs.  AR 61.  The VE confirmed that there was "no way to differentiate between the full and the part-time jobs according to those numbers."  AR 61.

## V.     ANALYSIS

As explained below, the ALJ erred by failing to adequately explain her step three finding that Plaintiff's impairments did not meet Listings 1.04(A) or 1.04(C).  *See Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (explaining that 42 U.S.C. § 405(b)(1) (2012)[7] requires the ALJ "to discuss the evidence and explain why he found that [the plaintiff] was not disabled at step three.") (internal citations omitted).  In addition, the Court concludes that this error was not rendered harmless by sufficiently detailed findings made elsewhere in the ALJ's decision.  The Court therefore vacates and remands this case to the ALJ, with directions to adequately explain whether Plaintiff's back condition satisfied the criteria for either listing, including addressing the durational requirement set forth by 20 C.F.R. § 404.1509 (2015).

As indicated *supra* at note 1, the Court also chooses in its discretion to address Plaintiff's claim that the ALJ erred at step five by relying on the VE's testimony that the number of jobs available in the national economy that Plaintiff could perform included unknown numbers of

---

[7] The relevant text of 42 U.S.C. § 405(b)(1) that was in effect at the time Plaintiff filed her applications for disability benefits on May 6, 2013, and June 12, 2013, is the same as what was published in 2012.  This was also the same version of the statute discussed in *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

both part-time and full-time jobs. The Court rejects this argument because it is at odds with the unanimous decisions of the federal circuits that have addressed the issue. The Court does not decide the other issues Plaintiff raised because the Court is remanding based on the ALJ's error at step three.

### A. The ALJ Committed Reversible Error by Failing to Explain Her Step Three Findings, and Her Step Four Findings Do Not Cure the Error

Plaintiff asserts that the ALJ erred by providing deficient analysis as to why Plaintiff's impairments did not meet Listing 1.04(A). Pl.'s Mot. 7. Plaintiff alleges that the ALJ did not discuss Plaintiff's spine Computed Tomography ("CT") scan in October 2013 or her July 2014 lumbar spine Magnetic Resonance Imaging ("MRI") scan, both of which showed that Plaintiff's impairments "satisfied more than one component of the introductory requirement of [Listing] 1.04." *Id*. at 7-9. Plaintiff identifies medical evidence of record that she believes prove that her impairments met Listing 1.04(A). *Id*. at 9-10. Due to the ALJ's inadequate explanation of her step three findings, Plaintiff argues that those findings are not supported by substantial evidence, and that this case should be reversed for immediate payment of benefits because Plaintiff "has provided medical evidence that she meets Listing [ ] 1.04."[8] *Id*. at 11.

The Commissioner responds that Plaintiff has not met her burden of showing that her impairments met or equaled each of the criteria of Listing 1.04. Def.'s Resp. 8, ECF No. 24. Furthermore, the Commissioner asserts that the ALJ's findings at step four serve to explain her finding that the evidence of record does not meet or equal the requirements of Listing 1.04. *See id*. at 9-11 (citing *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005)). The

---

[8] Plaintiff also asserts that if she "did not meet the Listing, the ALJ was still required to consider whether her impairment equaled the Listing. The ALJ did not complete that analysis either, which requires remand for rehearing." Pl.'s Mot. 12. Because these two sentences are the sum total of Plaintiff's "equaling" argument, and Plaintiff provided no other information or evidence regarding the legal standard for when an impairment equals a Listing, or why her impairment equaled Listing 1.04(A) and 1.04(C), the Court concludes that this argument is insufficiently developed and that it need not be addressed further. *See Adler v. Wal-Mart Stores Inc*., 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived[.]").

Commissioner points to Plaintiff's pattern of improvement coupled with setbacks, arguing that Plaintiff "cites to discrete portions of the record in support of her argument [that her impairments meet Listing 1.04]." *Id*. at 9-10. The Commissioner then parlays this argument into her assertion that "the ALJ reasonably found that [Plaintiff's] impairments were not so severe for 12 consecutive months that they were per se disabling under the listings." *Id*. at 10. In so arguing, the Commissioner does not cite to the portion of the ALJ's decision that contains this finding. *See id*. The Commissioner also contends that "no medical source opined that Plaintiff's back impairment was so severe that it met or medically equaled a listing, and the two state agency doctors explicitly found that it did not." *Id*. (citing AR 68-70, 87-90).

In reply, Plaintiff asserts that the Commissioner's arguments amount to impermissible *post hoc* rationalization. Pl.'s Reply 1-2, ECF No. 25. Plaintiff also argues that *Fischer-Ross* is distinguishable and "does not support the Commissioner's analysis[.]" *Id*. at 2. Plaintiff contends that medical records showing she improved with treatment must also be read along with other records showing that she "did not have normal functioning." *See id*. at 3. Plaintiff points out that the ALJ did not rely upon the opinions of the non-examining state agency physicians in finding at step three that Plaintiff's impairments did not meet or equal Listing 1.04, but regardless, Dr. Werner and Dr. Glass did not consider Listing 1.04 as part of their findings. *See id*. at 3-4. Finally, Plaintiff argues that the ALJ did not make a duration finding in her decision, and that because the ALJ found Plaintiff's left knee chondromalacia to be a severe impairment, "she did not invoke the duration requirement[.]" *Id*. at 4.

The Court's careful review of the ALJ's decision and the evidence of record compels its conclusion that the ALJ erred by not explaining her step three findings, and that her findings at step four do not cure that error. Because the Court cannot "confidently say that no reasonable

administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way," the Court reverses and remands for appropriate step three findings. *See, e.g., Dye v. Barnhart*, 180 F. App'x 27, 31 (10th Cir. 2006) (unpublished) (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)).

### 1.    Status of the law

The Listing of Impairments ("the listings") "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a) (2011)[9]. In other words, if a plaintiff has an impairment that meets the listings, it is severe enough that the plaintiff is conclusively presumed to be disabled. Some listings will "state a specific period of time for which [the plaintiff's] impairment(s) will meet the listing. For all others, the evidence must show that [the plaintiff's] impairment(s) has lasted or can be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1525(c)(4). A diagnosis alone will not cause an impairment to meet the listing; the impairment must still satisfy "all of the criteria in the listing." 20 C.F.R. § 404.1525(d). If a symptom "is one of the criteria in a listing, it is only necessary that the symptom be present in combination with the other criteria." 20 C.F.R. 404.1529(d)(2) (2011).[10] At step three in the sequential evaluation process, the ALJ considers "the medical severity of [the plaintiff's] impairment(s). If [the plaintiff] ha[s] an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, [the SSA] will find that [the plaintiff] [is] disabled." 20 C.F.R. § 404.1520(a)(4)(iii) (2012).

---

[9] This is the version of the regulation that was in effect at the time that Plaintiff filed her applications for benefits in 2013; it was amended most recently in 2017.

[10] This is the version of the regulation that was in effect at the time that Plaintiff filed her applications for benefits in 2013; it was amended most recently in 2017.

The listing at issue in this case is Listing 1.04, which addresses "Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." At the time the ALJ issued her decision, Listing 1.04 required the following:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.04 (2015).

In *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996), the Tenth Circuit described the appropriate analysis an ALJ should conduct at step three. *Clifton* instructed that 42 U.S.C. § 405(b)(1) requires an ALJ "to discuss the evidence and explain why he found that appellant was not disabled at step three." *Id.* at 1009 (citing *Cook v. Heckler*, 783 F.2d 1168, 1172-73 (4th Cir. 1986); *Brown v. Bowen*, 794 F.2d 703, 708 (D.C. Cir. 1986) ("The judiciary can scarcely perform its assigned review function, limited though it is, without some indication not only of what evidence was credited, but also whether other evidence was rejected rather than simply ignored.")). *Clifton* observed that "[t]his statutory requirement fits hand in glove with our standard of review[,]" emphasizing that a reviewing court "should not properly engage in the

task of weighing evidence in cases before the Social Security Administration." *Id.* An ALJ must support her findings with "specific weighing of the evidence" because without it, a reviewing court "cannot assess whether relevant evidence adequately supports the ALJ's conclusion that appellant's impairments did not meet or equal any Listed Impairment, and whether [the ALJ] applied the correct legal standard to arrive at that conclusion." *Id.*

The Tenth Circuit later applied harmless error analysis in the context of *Clifton*, holding that an ALJ's findings at steps four and five can "preclude [a plaintiff's] qualification [for disability] under the listings at step three" even if the ALJ erred by failing to adequately explain her step three findings. *Fischer-Ross*, 431 F.3d at 733-35. In so holding, *Fischer-Ross* noted that "*Clifton* did not categorically reject the application of harmless error analysis in the present context." *Id*. at 733. Although harmless error analysis is applied "cautiously in the administrative review setting[,]" it "nevertheless may be appropriate to supply a missing dispositive finding . . . where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Id*. at 733-34 (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)).

*Fischer-Ross* concluded that the ALJ's RFC findings at step four and five "clearly reject[ed]" and "conclusively negate[d]" the possibility that Fischer-Ross was presumptively disabled under either Listing 11.14 or Listing 1.04. 431 F.3d at 734-35. As to Listing 1.04, the Court held as it did because the ALJ found that the plaintiff retained the primary postural capacities for sedentary, light, and medium work, the ability to lift at the light RFC level, and the ability to stoop, crawl, crouch, and kneel occasionally, which meant that the plaintiff could not have been presumptively disabled under Listing 1.04. *Id.* at 735.

## 2. The ALJ's step three explanation was inadequate

The following is the sum total of the ALJ's findings at step three:

> The undersigned has considered the impairments listed in Appendix 1 to Subpart P of Part 404 of the Regulations and finds that [Plaintiff's] impairments do no[t] singularly or in combination meet or medically equal the required criteria for Listing 1.02, 1.04 or any other listed impairment. The signs, symptoms and history of treatment presented in the evidence of record are inconsistent with any impairment(s) of listing-level of severity.

AR 14. The ALJ did not explain what evidence was inconsistent with the listings, much less specify how it was inconsistent. The most relevant listing, 1.04(A), appears to require three different elements, the last of which is comprised of four sub-elements. *See* Tr. at 4-5 (Court and Plaintiff's counsel agreeing that Plaintiff bears burden at step three to show that she had (1) disorder of spine, (2) resulting in compromise of nerve root or spinal cord, (3) with evidence of nerve root compression that is itself characterized by (a) neuroanatomical distribution of pain, (b) limitation of motion of spine, (c) motor loss as manifested by atrophy with associated muscle weakness or muscle weakness itself, and (d) evidence of positive straight-leg test in both supine and seated positions).

At oral argument, counsel for the Commissioner conceded that the ALJ's step three finding and explanation were "undoubtedly very sparse." Tr. at 12. That description is charitable, for the Court prefers to characterize it as vague, perfunctory, sweeping, and deficient. The ALJ's threadbare description of why Plaintiff's condition did not satisfy Listing 1.04(A) in particular leaves the Court with a long list of questions about why that is so. Was it because the Plaintiff's evidence failed to satisfy the 12-month durational requirement? Was it because there was insufficient evidence that Plaintiff in fact had a "disorder of the spine?" Or could it be that the ALJ was unconvinced that Plaintiff had the requisite limitation of motion of the spine or muscle atrophy/weakness or positive straight-leg test? The Court simply cannot tell, given the

ultra-cursory explanation the ALJ gave at step three. *Clifton v. Chater* and its progeny require more before the Court can meaningfully exercise its substantial evidence review. The ALJ failed "to discuss the evidence and explain why [s]he found that [Plaintiff] was not disabled at step three." *See Clifton*, 79 F.3d at 1009. This failure means that the Court "cannot assess whether relevant evidence adequately supports the ALJ's conclusion that appellant's impairments did not meet or equal any Listed Impairment, and whether [the ALJ] applied the correct legal standard to arrive at that conclusion." *Id.*

The Court will pause here to observe that it was tempted to supply the answers to these and other questions itself. After all, at least with respect to analyzing a fixed, static, and immutable stack of medical records and making findings about whether they do or don't describe a disorder of listing-level severity, the ALJ's ability is probably not much better than this Court's. But doing so would have ensnared the Court in two black-letter prohibitions in administrative law: (1) engaging in *post hoc* rationalization, and (2) substituting its judgment for the Commissioner's. *See, e.g.*, *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004) (stating that affirming the district court's "post hoc effort to salvage the ALJ's decision would require us to overstep our institutional role and usurp essential functions committed in the first instance to the administrative process"); *see also Robinson v. Barnhart*, 366 F.3d 1078, 1084–85 (10th Cir. 2004) (per curiam) (same). It may well be that, on remand, the ALJ engages in the *proper* step three analysis and still finds (and then sufficiently explains) that Plaintiff did not satisfy her burden of showing that her condition meets or equals Listing 1.04(A). But the law requires the ALJ, not a reviewing court, to undertake that chore.

### 3. The ALJ's step four findings did not cure the step three error

For her part and to her credit, the Commissioner does not meaningfully advocate that the ALJ did not err at step three. Instead, relying principally on *Fischer-Ross*, the Commissioner urges the Court to excuse the error by concluding that the ALJ made sufficiently detailed findings at step four that should leave the Court confident that no other factfinder applying the appropriate step three analysis would have made a different listings decision. *See* Def.'s Resp. 10.[11]

After thoroughly examining and re-examining the ALJ's decision in this case, and mindful of its authority under *Fischer-Ross* to apply harmless error analysis, the Court simply cannot see its way clear to excuse the ALJ's step three error. At bottom, there is a dearth of "findings" at step four that would explain how and why the ALJ found that Plaintiff did not meet Listing 1.04(A). At oral argument, the Court repeatedly asked counsel for the Commissioner to point specifically to the findings at step four that conclusively negate one or more elements of Listing 1.04(A) or the durational requirement that Plaintiff's condition must satisfy. *See* Tr. at 14-22. It is enough to say that counsel struggled to do so, no doubt because the Court itself could not identify any such findings in its own review of the ALJ's decision.

Indeed, far from making "findings" at step four that could be used to excuse her step three error, the ALJ recited certain medical evidence that seemed to satisfy several of the requirements of Listing 1.04(A): in June 2012, "X-rays of the lumbar spine showed narrowing of the L5-S1 interspace with vacuum phenomenon; mild narrowing at L4-5; and slight to mild spur formation at a few lumbar levels[;]" in September 2012, a "physical therapy evaluation revealed

---

[11] The Commissioner also cites to *Chavez v. Berryhill*, 1:16-cv-518-KRS, 2017 WL 5508523, at *3-4 (D.N.M. Nov. 16, 2017) (unpublished), in support of this argument. Def.'s Resp. 10-11. As the Court pointed out at oral argument, however, *Chavez* is readily distinguishable. In *Chavez*, the ALJ's decision explaining why Chavez's conditions did not meet the relevant listings comprised six full paragraphs and more than a page and a half, which is a very different level of analysis than the two sentences the ALJ devoted to the issue in this case.

decreased lower extremity strength and hamstring length, pain and decreased functional ability" and "noted left leg muscle atrophy[;]" in January 2013, Plaintiff returned to physical therapy complaining that her sciatica had worsened; in July 2013, Plaintiff had a positive straight leg raising test, her "left leg [was] significantly smaller in diameter than right, consistent with atrophy; [she had] decreased sensation to touch in foot and toes . . . [s]he was unable to walk on tiptoes or heels." AR 15. In July 2014, Plaintiff's lumbar MRI "showed broad disc protrusion with effacement of S1 nerve root at L5-S1 and eccentric bulge to left with mild lateral recess stenosis at L4-5." AR 15. The ALJ also noted several periods of improvement when Plaintiff's pain was better, she had negative straight leg raising tests, and she could jog on the treadmill during physical therapy. AR 15.

Especially in light of this contradictory evidence, it was incumbent on the ALJ to explain how she concluded that Plaintiff did not meet Listing 1.04(A).[12] The ALJ's findings at step four indicate that Plaintiff had "evidence of nerve root compression," as indicated by her July 2014 MRI, which was characterized by neuro-anatomic distribution of pain (Plaintiff's sciatica). *See* AR 15. Plaintiff also had limitation of motion of the spine in December 2013, as she points out in her Motion, which the ALJ did not discuss, and the ALJ did not discuss why she ignored that part of Plaintiff's medical history. *See* AR 15, 476; Pl.'s Mot. 10. The evidence in the record also shows, and the ALJ recognized in her decision, that in July 2013, Plaintiff had motor loss

---

[12] Plaintiff also argues that she meets Listing 1.04(C), which requires "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.00 (2015); Pl.'s Mot. 10-11. Plaintiff does not point to any evidence in the record, and the Court did not find any, indicating that she had pseudoclaudication. Furthermore, although Plaintiff does suffer from sciatica, that condition is quintessential radiating or radicular pain, as opposed to nonradicular pain. At oral argument, Plaintiff's counsel could not point to any evidence in the record on which an ALJ could find that Plaintiff suffered from *non*-radicular pain and weakness which Listing 1.04(C) requires. *See* Tr. at 9-11. Nor did the Court locate any such evidence during its own exhaustive search of the record. Nonetheless, the Court does not further discuss Listing 1.04(C) because the Court is remanding for appropriate findings at step three, which will include discussion of Listings 1.04(A) and (C).

characterized by atrophy with associated muscle weakness and sensory or reflex loss with a positive straight leg raising test. AR 15, 367; *see* Pl.'s Mot. 9.

At oral argument, when the Court asked the Commissioner to point to a sentence in the ALJ's decision that specifically negated one or more components of Listing 1.04(A), the Commissioner was unable to do so. *See* Tr. at 15, 22. The ALJ did not make any findings at step four that conclusively negated the possibility that Plaintiff met Listing 1.04(A); to the contrary, the ALJ recited certain records that at the very least might support a finding that Plaintiff actually satisfied Listing 1.04(A) and that undermined her own step three findings. *See Dye*, 180 F. App'x at 30. Given this evidence, the Court cannot confidently say that no reasonable factfinder applying the correct step three analysis could make a different conclusion regarding whether Plaintiff met Listing 1.04(A). *See Fischer-Ross*, 431 F.3d at 735.

The Commissioner also argues that "the ALJ reasonably found that [Plaintiff's] impairments were not so severe for 12 consecutive months that they were per se disabling under the listings[,]" and that "no medical source opined that Plaintiff's back impairment was so severe that it met or medically equaled a listing, and the two state agency doctors explicitly found that it did not." Def.'s Resp. 10. Notwithstanding Commissioner's counsel's protestations at oral argument, these arguments constitute impermissible *post hoc* rationalization of the ALJ's decision. The ALJ never mentioned the opinions of the state agency physicians in the context of her listings analysis. The ALJ also never made a durational finding. At oral argument, the Commissioner contended that the ALJ made a durational finding simply by concluding that Plaintiff did not meet any listing because duration is presumed in the listing. *See* Tr. at  The Commissioner also emphasized at oral argument that the ALJ described how Plaintiff's symptoms "waxed and waned," and this description was enough to constitute a finding by the

ALJ that Plaintiff's impairment had not lasted or was not expected to last for twelve months.[13] The Court is not persuaded. The ALJ simply did not discuss how the evidence showed that Plaintiff did not meet the durational requirement, and this Court is forbidden from supplying that missing finding for the ALJ.

### 4. The proper remedy is remand, not award of benefits.

The Court declines Plaintiff's invitation to remand for direct payment of benefits, *see* Pl.'s Mot. 26, because to do so would apply an incorrect standard of review. The Court is persuaded by *Radford v. Colvin*, 734 F.3d 288, 294-95 (4th Cir. 2013), in which the Fourth Circuit observed that when an ALJ has inadequately explained his or her step three findings, the proper remedy is to vacate and remand with instructions for the ALJ to clarify why the plaintiff did not satisfy the listing.

In *Radford*, the ALJ found in part that the plaintiff's lumbar degenerative disc disease did not qualify as an impairment under Listing 1.04, but "provided no basis for his conclusion, except to say that he had 'considered, in particular,' [Listing 1.04A], and had noted that state medical examiners had also 'concluded after reviewing the evidence that no listing was met or equaled.'" *Id.* at 291-92 (internal alteration omitted). The district court agreed with the plaintiff that the ALJ's analysis concerning why he had not met Listing 1.04 was not supported by substantial evidence "because the ALJ's opinion failed to apply the requirements of the listings to the medical record." *Id.* at 292. The district court reversed the ALJ's decision and remanded the case with instructions to award benefits. *Id.* The Fourth Circuit considered this course of action, however, to be an abuse of discretion because the ALJ's insufficient legal analysis made

---

[13] The Commissioner also relied at oral argument on an Acquiescence Ruling issued three months after the ALJ's decision in this case. *See* Tr. at 15-18. This ruling had not been cited in the Commissioner's response brief. This Court, like nearly every other, does not permit new claims to be made for the first time at oral argument, so the Court considers the argument to be waived. Furthermore, whatever else may be said about the effect of such a ruling issued three months after the ALJ's decision in this case, the Court would likely be engaging in *post hoc* rationalization to rely upon it to prop up the ALJ's decision here.

it "impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings[,]" particularly in the presence of "conflicting evidence in the record as to whether [the plaintiff] satisfied the listing[,]" *Id.* at 294-96. Consequently, the Fourth Circuit reasoned that it was not for the district court to weigh the evidence in the first instance to determine whether the plaintiff was entitled to benefits. *Id.*

The Court therefore vacates the ALJ's decision and remands for appropriate findings and explanation at step three regarding whether Plaintiff met Listings 1.04(A) or (C).

**B.    The ALJ's Step Five Finding of Sufficient Jobs in the National Economy Was Supported by Substantial Evidence**

Although the Court is remanding this case to the SSA for further proceedings due to the ALJ's error at step three, the Court chooses to resolve one of Plaintiff's step five claims because it appears to be a matter of first impression in the Tenth Circuit. Although Plaintiff frames her argument as a failure of the ALJ to clarify ambiguous VE testimony, Plaintiff's contention is actually more direct: she essentially contends that a VE may never consider anything other than *full-time* jobs in computing the number of available positions for a given RFC in a given case. And Plaintiff would have the Court conclude that where, as here, a VE commingles full-time and part-time jobs and cannot apportion their percentages in the overall workforce, it is error *per se* for an ALJ to rely on such testimony. *See* Pl.'s Mot. 21-24.

As support for her position, Plaintiff argues first that "the regulations require that the RFC describe full time work[,]" citing Social Security Ruling 96-8p. This, she continues, means that "[t]he VE's recitation of numbers that include part-time jobs therefore did not provide substantial evidence for the ALJ's finding that [Plaintiff] could perform jobs that exist in significant numbers." *Id.* at 23-24 (citing *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005)). Plaintiff also contends that, because the VE considered part-time jobs in her analysis of

work available in the national economy, her testimony conflicted or was otherwise inconsistent with the ALJ's RFC finding, which must consider Plaintiff's ability to perform only full-time work.  *See* Pl.'s Mot. 21-24 (citing SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)).

The Commissioner's sole response is to invite the Court to go where apparently no other court has gone before, and that is to simply reduce by an arbitrary 50% the total number of available jobs about which the VE testified.  *See* Def.'s Resp. 16-17.  The Commissioner insists that the Court can "sort of apply some common sense," Tr. at 35, and infer that approximately half of the 260,000 total jobs the VE testified would be available to Plaintiff in the national economy were full-time jobs and the other half were part-time jobs.  The Commissioner did not cite any law in her brief to support this approach, and was unable to point to any during oral argument.  *See* Tr. at 35-36.  Counsel for the Commissioner further admitted that she has not suggested this approach in any previous case.  *Id.* at 34.[14]

The Court concludes that the ALJ did not err in relying on the VE's testimony that there were a total of approximately 260,000 full-time and part-time jobs in the national economy available to someone with Plaintiff's RFC.  The mistake in Plaintiff's argument is conflating the step four RFC inquiry with the different frame of reference permitted at step five.  Counsel and the Court all agree that – in calculating the RFC – an ALJ must consider only whether a plaintiff's impairments still allow him or her to work *full-time*.  That principle, after all, is black-letter law expressed most clearly in SSR 96-8p.  But neither that SSR nor any other regulation, statute, or controlling case provides that the *step five* analysis is similarly limited.  And that is where the Court and counsel part ways.

---

[14] At oral argument, counsel for the Commissioner curiously *agreed* with Plaintiff's counsel that Social Security statutes and regulations dictate that a VE should only consider full-time jobs when providing step five testimony. *See* Tr. at 33-34.  But it is clear to the Court that both counsel were contemplating what an ALJ must consider when determining the RFC at *step four*, as opposed to the *step five* inquiry of the number of available jobs in the national economy.

At oral argument, Plaintiff's counsel admitted that the sources on which she was relying – SSR 96-8p, SSR 00-4p, and *Grogan* – do not support the position for which she cited them. *See* Tr. at 30-32. Plaintiff's counsel then referred to *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007), *see* Tr. at 31-32, but that case is also silent on the issue. Ultimately, Plaintiff's counsel could not provide any legal reference at all supporting her position that it is error for the ALJ to consider anything but full-time jobs when conducting the fifth and final step of the evaluation. *See* Tr. at 32. For her part, the Commissioner provided the Court with no legal support either. Indeed, the Commissioner conceded that the SSA's own regulation that governs the step five analysis of whether sufficient work exists in the national economy, 20 C.F.R. § 404.1566, does not speak at all to any distinction between full-time and part-time jobs. Tr. at 38-39.

In the absence of any legal authority in support of the parties' position, the Court believes the more prudential route to take is to endorse what appears to be the unanimous rule from other circuits that have addressed the issue. For example, the Seventh Circuit has held that a VE may "testify as to the numbers of jobs that a claimant can perform without specifically identifying the percentage of those jobs that are part-time." *Liskowitz v. Astrue*, 559 F.3d 736, 745 (7th Cir. 2009). The Seventh Circuit's reasoning was premised on the distinction between the sequential evaluation at step four and step five. *Liskowitz* concluded that SSR 96-8p "applies to the ALJ's functional capacity determination, not to the VE's testimony. Again, having determined that a claimant has a severe impairment, the ALJ must, inter alia, assess her residual functional capacity and then determine whether there are a significant number of jobs in the national economy that she can perform." *Id. Liskowitz* continued:

> Ruling 96–8p does not say, nor do we interpret it to imply, that a VE may permissibly testify only as to the availability of full-time jobs. On the contrary, to say that the ALJ may deny benefits only if she finds the claimant capable of some form of full-time work is quite different from saying that only full-time jobs can

> constitute significant work in the national economy. To return to our previous example, a person who is functionally capable of running professionally should not be deemed disabled simply because some of the jobs that are available for professional runners are part-time jobs.

*Id.* *Liskowitz* noted that it was consistent with the Eleventh Circuit's decision in *Kelley v. Apfel*, 185 F.3d 1211 (11th Cir. 1999) (per curiam). *Id.; see also Miller v. Astrue*, 2009 WL 3566649 (E.D. Ky. 2009).

In *Kelley*, the Eleventh Circuit noted that "work, or the ability to work, is relevant in at least two distinct steps of the sequential analysis for determining entitlement to disability benefits, i.e., Steps One and Five." 185 F.3d at 1214. Because step one "asks whether the claimant is currently engaging in 'substantial gainful activity' . . . [i]f the claimant is so engaged, he is not disabled. At Step One, there is no *per se* rule that part-time work cannot constitute substantial gainful activity." *Id.* (internal citations omitted). As *Kelley* pointed out, the regulatory definition of substantial gainful activity explicitly includes part-time work. *Id.* (citing 20 C.F.R. § 404.1572(a) ("Your work may be substantial even if it done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.")). *Kelley* stated that, at step five, the ability to work is relevant, and acknowledged the Commissioner's argument that "an ability to do part-time work does not preclude a finding of disability at Step Five." *Id.* *Kelley*, however, stopped short of concluding that part-time work can *never* be utilized to satisfy the Commissioner's burden at step five. Indeed, to so conclude would be inconsistent with 42 U.S.C. § 425(d)(2)(A) and 20 C.F.R. § 404.1572(a), which both recognize that if a claimant is engaged in substantial gainful activity, which includes part-time work, then the claimant is not disabled so long as the claimant otherwise has the capability to work full-time.

The Eighth Circuit has adopted the Seventh Circuit's approach in *Liskowitz*, holding that the VE "was neither required to articulate the percentage of available jobs that were part-time or

full-time, nor to describe labor market conditions beyond the data that were readily available." *Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010). The Second Circuit has followed suit, declining "to create a *per se* rule prohibiting an ALJ from considering part-time positions" and rejecting the plaintiff's argument "that the ALJ erred by allowing the VE to provide employment numbers that might have included part-time positions[.]" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 450 n.6 (2nd Cir. 2012). *Brault* continued, "The ALJ did not need to find specific numbers of jobs - all he was required to do was find that 'substantial' positions exist. There was substantial evidence supporting that finding." *Id.*

The Court finds the opinions of the Second, Seventh, and Eighth Circuits to be persuasive. The Court also observes that 20 C.F.R. § 404.1566, which defines work available in the national economy, does not require that work to be full-time only. Accordingly, the Court concludes that the ALJ did not err in relying on the VE's testimony that 250,000 jobs were available to Plaintiff in the national economy, even though some unknown percentage were part-time jobs.[15]

## VI.    CONCLUSION

It would be possible for the Court to review the record in this case and construct a rationale based principally on the medical records for why Plaintiff did not meet Listing 1.04, but that would be supplying a *post hoc* rationalization, which is outside the Court's purview. After an extensive review of the record and the ALJ's decision, the Court cannot say with confidence that no reasonable fact finder would have made a different decision had the proper step three findings been made. The Court therefore concludes that the ALJ committed legal error by failing to make

---

[15] Plaintiff makes a separate step five claim that the ALJ erred in finding that there remain in the national economy a sufficient number of "Office Clerk" positions. *See* Pl.'s Mot. 24-25. Although the Court need not and does not decide this issue, the Court would be hard-pressed to conclude that the ALJ's finding on that ground was not supported by substantial evidence, considering the VE testified directly to that point.

adequate findings at step three as to why Plaintiff did not meet that listing, and further concludes that the ALJ's step four findings do not cure that inadequacy. Finally, the Court discerns no step five error in the ALJ's finding that sufficient numbers of full-or-part-time jobs exist in the national economy that could be performed by someone with Plaintiff's RFC.

**IT IS THEREFORE ORDERED** that Plaintiff's "Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, For Rehearing, With Supporting Memorandum" [ECF No. 22] is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that the Commissioner's final decision is **VACATED AND REMANDED** to the SSA for further review consistent with this opinion.

**IT IS SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*